UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.: _____ |
| | : | |
| v. | : | |
| | : | Violations: |
| | : | |
| NICK PARK, a/k/a NOCHOL PARK, | : | 18 U.S.C. § 201 (Bribery of a |
| | : | Public Official) |
| | : | |
| Defendant. | : | 18 U.S. C. § 2 (Aiding and Abetting |
| | : | and Causing an Act to be Done) |

**I N F O R M A T I O N**

The United States Attorney charges:

**Relevant Entities and Individuals**

1. From in or about January 2007 through in or about August 2007, the defendant, NICK PARK, a/k/a NOCHOL PARK ("PARK"), was an employee of Nova Datacom, LLC ("Nova Datacom"). Beginning in or about August 2007, PARK became the co-founder and President of Unisource Enterprise Inc. ("UEI").

2. Nova Datacom was a Virginia limited liability corporation formed on or about February 5, 2004. In September 2007, Nova Datacom was certified by the U.S. Small Business Administration ("SBA") as an 8(a) small disadvantaged business. Nova Datacom provided information assurance and security services to commercial companies and federal departments and agencies, including the United States Army Corps of Engineers and the United States Army. Nova Datacom maintained its corporate headquarters in Sterling, Virginia and, later, in Chantilly, Virginia.

3. YOUNG N. CHO, also known as ALEX N. CHO ("CHO"), was the Chief Technology Officer of Nova Datacom, LLC ("Nova Datacom").

4. Nova Datacom Employee A was the President of Nova Datacom.

5. UEI was incorporated in Virginia on or about August 24, 2007. UEI provided information technology services to the United States Department of the Army. UEI maintained its corporate headquarters in Annandale, Virginia.

6. Co-Conspirator 3 ("CC-3") was a co-founder of UEI. In or about August 2008, CC-3 became the Vice President-Operations of UEI. At the same time that CC-3 was the Vice President-Operations of UEI, CC-3 worked full-time for another government contractor.

7. The United States Army Corps of Engineers ("USACE") was a branch of the United States Army made up of approximately 34,000 civilian and military personnel. The Headquarters for the USACE was located at 441 G Street, N.W., in the District of Columbia. The Directorate of Contingency Operations ("DCO") was a branch of the USACE. The USACE administered the Technology for Infrastructure, Geospatial, and Environmental Requirements ("TIGER") Contract. The TIGER Contract was a vehicle that authorized federal government agencies and departments used to purchase products and services.

8. KERRY F. KHAN ("KHAN") was a Program Manager with the USACE's DCO at Headquarters in Washington, D.C. As part of his duties as a public official, KHAN was involved in, among other things, placing orders for the DCO through federal government contracts. While a USACE employee, KHAN was a public official.

9. MICHAEL A. ALEXANDER ("ALEXANDER") was a Program Manager with the USACE's DCO at Headquarters in Washington, D.C. As part of his duties as a public official, ALEXANDER was responsible for, among other things, developing requirements, writing program

and project justifications, and obtaining funding for USACE projects and programs placed through government contracts. While a USACE employee, ALEXANDER was a public official.

10. Eyak Technology, LLC ("EyakTek"), was an Alaska Native-owned Small Business and the prime contractor for the TIGER Contract. EyakTek maintained offices in Dulles, Virginia.

11. The United States Army's Program Executive Office Enterprise Information Systems ("PEO EIS") was a bureau with the Department of the Army that provided infrastructure and information management systems to the Army. The Project Manager, Defense Communications and Army Transmission Systems ("PM DCATS"), was a division of PEO EIS.

12. Public Official C was an Assistant Project Manager for PM DCATS. While employed at PM DCATS, Public Official C was a public official. Until in or about May 2010, Public Official C resided and worked in Seoul, South Korea. Since in or about May 2010, Public Official C resided in Fairfax Station, Virginia, and worked at Fort Belvoir, Virginia. Public Official C became a public official in or about July 1990.

## The Nova Datacom Bribery Scheme

**A. The Nova Datacom Bribery Scheme involving KHAN and ALEXANDER**

13. In or about 2005, PARK met KHAN through CC-3. At the time, PARK was interested in becoming a government contractor. CC-3 told PARK that the way to become a government contractor was by, among other things, building relationships with public officials. For several months, PARK and KHAN saw each other at social occasions. During that time period, KHAN advised PARK to identify a government contracting company to begin obtaining government contracts.

14. In or about early 2007, PARK introduced KHAN to CHO and Nova Datacom. In or about the same time, PARK joined Nova Datacom. PARK and CHO agreed to use Nova Datacom as the corporate vehicle to obtain government contracts based on PARK's relationship with KHAN. PARK and CHO agreed to make Nova Datacom Employee A the President of Nova Datacom to obtain 8(a) small disadvantaged business status from the SBA, which would assist Nova Datacom in its efforts to obtain government contracts.

15. Following discussions with PARK and CHO, KHAN agreed to use his official position to direct orders from the USACE to Nova Datacom. In exchange for KHAN using his official position to direct the orders to Nova Datacom, PARK, CHO, and Nova Datacom Employee A agreed to provide things of value to KHAN.

16. In or about the Spring of 2007, KHAN used his official position to direct an order from the USACE to Nova Datacom. CHO negotiated with KHAN the amount of money that Nova Datacom would pay to KHAN in exchange for the order. After CHO told PARK the amount of money to pay KHAN, PARK hand-delivered a cash payment of approximately $10,000-$15,000 to KHAN. PARK obtained the cash for KHAN's payment from Nova Datacom Employee A. Nova Datacom Employee A knew the $10,000-$15,000 in cash was intended for KHAN in return for KHAN's official assistance in directing the order to Nova Datacom.

17. KHAN introduced PARK to ALEXANDER. KHAN told PARK that KHAN shared a portion of the cash with ALEXANDER for ALEXANDER's assistance in directing the orders to Nova Datacom. PARK developed a social relationship with ALEXANDER. PARK entertained ALEXANDER at PARK's house and gave ALEXANDER a bottle of Louis XIII de Remy Martin Grand Champagne Cognac that was worth approximately $2000.

18.     In or about July 2007, KHAN used his official position to direct an order to Nova Datacom. CHO negotiated with KHAN the amount of money that Nova Datacom would pay KHAN in exchange for the order. PARK complained to KHAN that KHAN was demanding too much money for directing the order to Nova Datacom. KHAN repeatedly changed the amount of monies that KHAN wanted in exchange for directing the order to Nova Datacom. KHAN ultimately agreed to accept $40,000 for KHAN's official assistance in directing the order to Nova Datacom. With CHO's knowledge, PARK hand-delivered the cash payment of $40,000 to KHAN at a Starbucks Coffee shop in Northern Virginia. PARK obtained the cash for KHAN's payment from Nova Datacom Employee A, who brought the cash to PARK at the Starbucks Coffee shop. Nova Datacom Employee A knew the $40,000 in cash was intended for KHAN in return for KHAN's official assistance in directing the award to Nova Datacom.

19.     In or about August 2007, CHO informed PARK that KHAN intended to direct another order to Nova Datacom. The value of the potential order was several hundreds of thousands of dollars. Unlike the prior orders, KHAN stated that the order to Nova Datacom would be through EyakTek and the TIGER Contract. Also unlike the prior orders, KHAN stated that Nova Datacom would not have to provide any equipment or services in return for obtaining payment for the order. PARK declined to go forward with the order based on, among other things, PARK's concern that the fictitious contract would be detected and KHAN's erratic behavior.

20.     In or about August 2007, PARK ended his business association with KHAN, CHO, Nova Datacom Employee A, and Nova Datacom. PARK advised CHO not to continue to do business with KHAN.

### B.      The Nova Datacom Bribery Scheme involving Public Official C

21.     In or about May 2007, PARK met Public Official C through KHAN.  Like KHAN, Public Official C provided advice to PARK on how PARK could obtain government contracts.  In or about June 2007, as part of PARK's efforts to establish a business relationship with Public Official C and others, PARK purchased a first-class airline upgrade for Public Official C to travel from Seoul, South Korea to the Philippines.  While in the Philippines, PARK paid for hotel accommodations, meals, and entertainment for approximately ten individuals, including Public Official C, other public officials associated with Public Official C, and government contractors.

22.     In or about June 2007, Public Official C used Public Official C's official position to direct an order through the USACE to Nova Datacom for equipment to be provided to PM DCATS.  In exchange for Public Official C directing orders to Nova Datacom, PARK, CHO, and Nova Datacom Employee A agreed to provide things of value to Public Official C.  Public Official C agreed to accept a payment of $40,000 in exchange for directing the order to Nova Datacom.

23.     In July 2007, PARK and CHO traveled from Northern Virginia to Hawaii for the purpose of, among other things, making the cash payment to Public Official C.  PARK and CHO each carried $20,000 in cash to Hawaii.  In Hawaii, PARK hand-delivered the cash payment of $40,000 to Public Official C.

### The UEI Bribery Scheme

24.     After PARK left Nova Datacom, PARK and CC-3 decided to use UEI as a vehicle to obtain government contracts based on their relationships with Public Official C.  PARK, Public Official C, and CC-3 agreed that Public Official C would be a "silent partner" in UEI.  In exchange for Public Official C's ownership interest in UEI, Public Official C agreed to use Public Official C's

official position to direct orders from PM DCATS to a prime contractor to be subcontracted to UEI. PARK, Public Official C, and CC-3 agreed that Public Official C would obtain the benefit of Public Official C's undisclosed ownership interest in UEI after Public Official C left the government.

25.     Beginning in or about August 2008, Public Official C used Public Official C's official position to provide confidential bid information to assist UEI to obtain a subcontract from PM DCATS via a prime contractor. On or about September 16, 2008, Public Official C sent an e-mail to PARK from Public Official C's personal e-mail account. Public Official C stated the following in the e-mail: "didn't include [CC-3] on email distr[ibution]. You can share my stuff with him . . . only thing I request is that you do not forward my email . . . instead, send it like your [sic] writing it." Public Official C attached to the e-mail the following: (a) a Technical Request for a planned order to be awarded by PM DCATS called the Eighth United States Army Command and Control C4IT Technical Support Services (the "C4IT Contract"); and (b) a Cost Estimate for the C4IT Contract. Public Official C stated the following regarding the Cost Estimate: "this is FOR YOU ONLY . . . so that you can see how we costed the first three months (call me and I'll explain)."

26.     On September 16, 2008, CC-3 created an e-mail account and password for Public Official C at UEI. To conceal Public Official C's identity, Public Official C was given the alias "Joseph Lynn" to use as the name of Public Official C's e-mail address at UEI. The password for Public Official C's e-mail address at UEI was "ruinsane." The job title for "Joseph Lynn" at UEI was "PM/Business Development Manager."

27.     On or about September 22, 2008, Public Official C, using the alias Joseph Lynn, sent an e-mail to PARK and CC-3. In the e-mail, Public Official C stated that Public Official C had spoken to the prime contractor about the C4IT Contract and there was "concurrence to do what is

necessary to get UEI in place by next week." Public Official C attached to the e-mail confidential bid information for the upcoming C4IT Contract, including a revised Technical Request for the C4IT Contract and a Cost Estimate for the C4IT Contract. Public Official C stated the following regarding the Cost Estimate for the C4IT Contract: "what I used to develop the cost estimate . . . for your reference only."

28. On or about September 22, 2008, the prime contractor submitted via e-mail to CC-3 a Statement of Work for the C4IT Contract proposal, which was identified as Task number 262-08-001-W15P7T-06-D-E407-0009. The prime contractor requested that CC-3 submit a Task Execution Plan and cost information. CC-3 replied to the prime contractor's e-mail and copied PARK and "Joseph Lynn" on the e-mail. Public Official C replied to CC-3 and PARK as follows: "Great to see that your [sic] thinking of me but have a request . . . do not include me on other correspondence. I'd rather that you copy me separately on e-mails outside of you [CC-3] and Nick [PARK]."

29. To submit UEI's response to the prime contractor, Public Official C created UEI's cost proposal for the C4IT Contract. On or about September 23, 2008, Public Official C sent the following e-mail to CC-3 and PARK regarding Public Official C's involvement in assisting UEI bid on the C4IT Contract: "Feel like I'm walking a very thin tight-rope. I want to help and work with you but . . . don't want to end up doing all the work myself (even after we get on contract, I just don't have time to do so). . . . . Rather than profess to 'know it all,' I'd rather send you some samples of other companies (please keep this to yourself and don't let it go anywhere else) so you could see what they wrote." On or about September 24, 2008, Public Official C, posing as Joseph Lynn, sent the following e-mail to PARK and CC-3: "I am full into this. I am investing my entire future on this.

I really am looking to work side-by-side with you [CC-3] and Nick [PARK] at some point and grow this company."

30. On or about September 30, 2008, the prime contractor issued an order to UEI for the C4IT Contract. The amount of the order, including all options, was $1,131,353.20. The period of performance was from October 1, 2008 through March 28, 2009.

31. After Public Official C used Public Official C's official position to direct the award of the C4IT Contract to UEI via the prime contractor, PARK traveled to Korea to meet with Public Official C. During the meeting, Public Official C demanded approximately $3000 in cash from PARK to spend on a family ski vacation. PARK argued with Public Official C over the demand because PARK did not want to make cash payments to Public Official C as PARK had done while PARK was at Nova Datacom. PARK declined to make the cash payment to Public Official C. Thereafter, PARK ceased his business relationships with Public Official C and CC-3. CC-3 subsequently left UEI and joined the government contractor that was the successor to UEI on the subcontract that UEI had obtained from the prime contractor through Public Official C's official assistance.

## COUNT ONE
### (Bribery of a Public Official)

32. Paragraphs 1 through 20 of this Information are realleged and incorporated by reference as if set out in full.

33. From in or about January 2007 to in or about August 2007, in a continuing course of conduct, in the District of Columbia and elsewhere, defendant NICK PARK, a/k/a NOCHOL PARK, did, directly and indirectly, corruptly give, offer, and promise things of value to a public official,

namely KERRY F. KHAN, and corruptly offered and promised things of value to KHAN personally and to other persons and entities as directed by KHAN, with the intent to influence official acts, to influence KHAN to commit and aid in committing, collude in, and allow fraud, and make opportunity for the commission of fraud on the United States, and to induce KHAN to do and omit to do acts in violation of KHAN's lawful duties, to wit, NICK PARK gave, offered, and promised approximately $55,000 for KHAN's personal use in return for KHAN using KHAN's official assistance to direct orders from the USACE to Nova Datacom and providing preferential treatment for Nova Datacom with potential contracts awarded through the USACE.

**(Payment of a Bribe to a Public Official, in Violation of Title 18, United States Code, Sections 2 and 201(b)(1)(A), (B), and (C))**

### COUNT TWO
### (Bribery of a Public Official)

34. Paragraphs 1 through 31 of this Information are realleged and incorporated by reference as if set out in full.

35. From in or about May 2007 to in or about January 2009, in a continuing course of conduct, in the District of Columbia and elsewhere, defendant NICK PARK, a/k/a NOCHOL PARK, did, directly and indirectly, corruptly give, offer, and promise things of value to a public official, namely Public Official C, and corruptly offered and promised things of value to Public Official C personally and to other persons and entities as directed by Public Official C, with the intent to influence official acts, to influence Public Official C to commit and aid in committing, collude in, and allow fraud, and make opportunity for the commission of fraud on the United States, and to induce Public Official C to do and omit to do acts in violation of Public Official C's lawful duties, to wit, NICK PARK gave, offered, and promised approximately $40,000 and an ownership interest

in UEI for Public Official C's personal benefit in return for Public Official C using Public Official C's official assistance to direct orders to Nova Datacom and UEI and providing preferential treatment for Nova Datacom and UEI with potential contracts awarded through the Department of Army.

**(Payment of a Bribe to a Public Official, in Violation of Title 18, United States Code, Sections 2 and 201(b)(1)(A), (B), and (C))**

RONALD C. MACHEN JR.
United States Attorney
In and For the District of Columbia

By: _____
MICHAEL K. ATKINSON
D.C. Bar No. 430517
BRYAN SEELEY
D.C. Bar No. 501681
Assistant United States Attorneys
Fraud and Public Corruption Section
555 4th Street, N.W.
Washington, D.C.  20530
202.252.7817 (Atkinson)
202.252.1749 (Seeley)
Michael.Atkinson2@usdoj.gov

DATED: April 20, 2012                           Bryan.Seeley@usdoj.gov